# United States Court of Appeals

## For the Eighth Circuit

_____

No. 14-1589

_____

Terry M. Turner

*Plaintiff - Appellant*

v.

Sidney Mull, Sergeant, Correctional Officer, Transportation Supervisor; Angela Chandler, Hospital Administrator; Robert Thebeau, Correctional Officer; Terry Russell; Pete Koenig; John Doe, Correctional Officer

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 13, 2015
Filed: April 28, 2015

_____

Before SMITH, BENTON, and SHEPHERD, Circuit Judges.

_____

SMITH, Circuit Judge.

Terry Turner brought this suit against several officials at the Eastern Reception Diagnostic Correctional Center in Bonne Terre, Missouri (ERDCC), asserting violations of his rights under the Eighth Amendment; the Fourteenth Amendment; Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131 *et seq*.; and

§ 504 of the Rehabilitation Act, 29 U.S.C. § 794. The district court[1] granted summary judgment to the officials on all claims. We affirm.

## I. *Background*

At all times relevant to this case, Turner was an inmate at the ERDCC. Turner suffered from a neurological disorder but was able to ambulate, stand, and sit with the use of leg braces and crutches. Although Turner sought and received medical care for his neurological condition on multiple occasions in 2011, no physician ordered that Turner be provided use of a wheelchair. Similarly, no physician ordered that the ERDCC transport Turner in a wheelchair-accessible van.

The ERDCC had a wheelchair-accessible van equipped with a "lift"—that is, a device that raises wheelchair users from the ground to the floor level of the van and vice versa. The ERDCC generally restricted the van's use to actual wheelchair users, and signage on the van separately advised that only wheelchairs were allowed on the wheelchair lift and that standing on the lift was forbidden to avoid falls. Thus, before allowing inmates to use the wheelchair-accessible van, the ERDCC generally required that inmates receive a medical order for transportation via a wheelchair-accessible vehicle and that the inmates arrive at the transportation area in a wheelchair.

On March 22, 2011, Transportation Officer Pete Koenig and Correctional Officer Robert Thebeau transported Turner to and from a medical appointment at the Capitol Regional Medical Center in Jefferson City, Missouri (CRMC). Turner arrived at the transportation area with neither a wheelchair nor a physician's order to use a wheelchair-accessible van. Consequently, he was transported to and from the CRMC in a non-wheelchair-accessible van. Turner alleges that, due to physical limitations allegedly associated with his neurological condition, the only way he could enter the

---

[1]The Honorable John A. Ross, United States District Judge for the Eastern District of Missouri.

van was by crawling into it. He also alleges, among other things, that urine and vomit were on the van floor and that he was unable to eat a sack lunch while traveling in the van because of his exposure to the unsanitary conditions.

Turner also alleges that, during his return trip from the CRMC, Thebeau stopped the van near a bridge for approximately five minutes. At some time during the stop, according to Turner, Thebau mentioned that he and Koenig could drown Turner and claim that Turner tried to escape. Thebeau and Koenig then allegedly looked at Turner and laughed. Turner admits that he "do[es not] know if they [were] playing or not."

Approximately two months later, on May 19, 2011, Turner filed an Inmate Resolution Request concerning the alleged events that occurred on March 22, 2011. At some point thereafter, according to Turner, prison staff searched and "ransacked" his cell in retaliation for his lodging the complaint. Turner alleges that Thebeau was present when his cell was searched. Turner further alleges that Thebeau retaliated against him by visiting "3-House," the housing unit in which Turner was incarcerated, and calling Turner "names" and using "expletives."

On September 5, 2011, Angela Chandler, an employee of Corizon, Inc. who served as the Health Services Administrator at the ERDCC, requested via email to ERDCC Transportation Supervisor Sidney Mull that Turner be transported in a "wheelchair, handicapped-accessible van" for medical appointments. Chandler was not a physician, but Turner had informed her earlier that same day that he found it uncomfortable and difficult to ride in the non-wheelchair-accessible van. In response to Chandler's email, Mull informed Chandler that he was willing to transport Turner in the wheelchair-accessible van (even though Turner lacked any medical order to that effect); however, Mull made clear that Turner—per facility policy—must arrive at the transportation area in a wheelchair:

The only way I can load him via the lift on the handicap van is if he is in a wheelchair. The vehicle has a warning not to load people with it due to the risk of falling. If he comes down in a wheelchair I will definitely take him in the handicap van.

On October 20, 2011, Turner was transferred to the Western Missouri Correctional Center in Cameron, Missouri (WMCC). Koenig was one of the transportation officers who transported Turner to the WMCC. Turner alleges that he was transported in a non-wheelchair-accessible van for part of the trip, although he was transported in a wheelchair-accessible van for the remainder of the trip.

## II. *Procedural History*

Turner filed suit against Mull, Thebeau, Koenig, Chandler, and ERDCC Warden Terry Russell. Turner asserted (1) claims under 42 U.S.C. § 1983 against all of the officials, in both their individual and official capacities, for alleged violations of Turner's Eighth and Fourteenth Amendment rights; (2) a claim under 42 U.S.C. § 1983 against Thebeau for alleged retaliation; (3) claims against all of the officials, in both their individual and official capacities, for alleged violations of Turner's rights under Title II of the ADA and § 504 of the Rehabilitation Act; and (4) an additional retaliation claim against Thebeau for alleged retaliation in violation of Turner's rights under the ADA and Rehabilitation Act.

The district court granted summary judgment to the officials on all claims. With respect to the official-capacity claims, the court held that "[t]he undisputed facts . . . do not support a finding that [Turner] required handicapped-accessible transportation, or that such transportation would have benefitted [Turner]" given that Turner was "able to ambulate with the use of leg braces and crutches" and that "no physician had ordered a wheelchair for [Turner]." The court also found that the ERDCC's policy "requiring inmates to be in wheelchairs in order to utilize the wheelchair-accessible vans was for their own safety" and that the ERDCC was not

-4-

required to compromise inmates' safety "simply because [Turner] believed that a wheelchair-accessible van was more comfortable." The court dismissed the § 1983 individual-capacity and Rehabilitation Act claims largely on the same grounds.

The court held that Turner's relatively brief exposure to the allegedly unsanitary conditions in the van did not rise to the level of a constitutional violation. Likewise, the court also held that Thebeau's alleged threat to drown Turner was not a constitutional violation because it was a one-time, isolated incident and Thebeau took no action in furtherance of the alleged threat.

With respect to Thebeau's alleged retaliation, the court found that Turner provided no evidence that Thebeau directed or was otherwise in charge of the search. The court also found that Turner had proffered insufficient evidence to show that the search and accompanying property damage were in retaliation for Turner lodging any complaints.

Finally, because the court found no constitutional violations, it held that Mull, Thebeau, Koenig, and Russell (collectively, "Prison Defendants") were additionally entitled to qualified immunity with respect to Turner's § 1983 claims.

## III. *Discussion*

On appeal, Turner challenges the district court's grant of summary judgment with respect to (1) his official-capacity claims, (2) his individual-capacity claims against all of the officials except Russell, (3) his retaliation claims, (4) his Rehabilitation Act claim against all of the officials except Chandler, and (5) the Prison Defendants' qualified immunity.

We review de novo the district court's grant of summary judgment. *Hayek v. City of St. Paul*, 488 F.3d 1049, 1054 (8th Cir. 2007) (citation omitted). We will affirm the district court's grant of summary judgment if "there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To establish a genuine issue of material fact, Turner "may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in [his] favor." *Davidson & Assocs. v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005) (citation omitted).

## A. *Official-Capacity Claims*

"Official-capacity liability under 42 U.S.C. § 1983 occurs only when a constitutional injury is caused by 'a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" *Grayson v. Ross*, 454 F.3d 802, 810–11 (8th Cir. 2006) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). Turner may prevail on his official-capacity claims by identifying a policy that "constitutes either deliberate indifference to medical needs or a punishment." *Haslar v. Megerman*, 104 F.3d 178, 180 (8th Cir. 1997) (citations omitted). "To establish a claim of deliberate indifference to serious medical needs under § 1983, [Turner] must demonstrate that he suffered from an objectively serious medical need and that [the officials] actually knew of but deliberately disregarded the need." *Santiago v. Blair*, 707 F.3d 984, 990 (8th Cir. 2013) (citation omitted).

In the main, Turner argues that the officials violated his constitutional rights by enforcing a policy that generally restricts use of the wheelchair-accessible van to inmates in wheelchairs. As a result, according to Turner, the officials were deliberately indifferent to Turner's alleged serious medical needs and "forced" him to crawl into the van and to his seat. We disagree.

As a threshold matter, we note that Turner was not "forced" to endure the hardships of which he now complains; indeed, he could have entirely avoided having to crawl into the van by, for instance, using a wheelchair. But he did not, even though, as Turner concedes, wheelchairs were "readily available" there at the

transportation area. In fact, Turner admitted during his deposition that he did not even ask to use any of those readily available wheelchairs. Turner may also have avoided crawling into the van by seeking and obtaining a physician's order to be transported in a wheelchair and a wheelchair-accessible van.

In any event, the record does not support Turner's assertion that he had an objectively serious medical need requiring that he use a wheelchair-accessible van. As noted above, no physician ordered or issued a wheelchair for Turner, much less ordered that he be transported in a wheelchair-accessible van—even though Turner sought and obtained medical care for his neurological condition multiple times in 2011. At least one physician specifically deemed that transportation in a wheelchair-accessible vehicle was *not* necessary for Turner given in part that he was able to "walk with a leg/torso brace" and "able to sit in a regular vehicle."[2] Furthermore, Turner neither used nor requested to use any of the wheelchairs that were "readily available" in the transportation area.

The ERDCC and the officials proffered good reasons for enforcing the wheelchair-users-only policy. It is undisputed that improperly using or standing on the lift "was considered dangerous due to the possibility of a fall." In short, the wheelchair-users-only policy represented a rational safety measure for inmates. It is certainly conceivable that if the ERDCC did not enforce the policy, it would face a risk of lawsuits from those same inmates in the event they injured themselves while using the lift improperly. Consequently, as the district court found, the "ERDCC staff was not required to compromise its own policy and the safety of its inmates simply because [Turner] believed that a wheelchair accessible van was more comfortable" or convenient. The officials' refusal to deviate from this policy did not constitute

---

[2]The ERDCC's non-wheelchair-accessible minivans sit closer to the ground than wheelchair-accessible vehicles, have dual-sliding doors, and have seats that lean forward.

"deliberate indifference" or some other unconstitutional conduct. *See, e.g., Farmer v. Brennan*, 511 U.S. 825, 834 (1994) ("[A] prison official violates the Eighth Amendment only when . . . the deprivation alleged [is], objectively, 'sufficiently serious' . . . [and results] in the denial of 'the minimal civilized measure of life's necessities.'" (citations omitted)).

## B. *Individual-Capacity Claims*

Turner may establish claims against the officials in their individual capacities under § 1983 if they deprived Turner "of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. On appeal, Turner argues that the officials violated his constitutional rights in various ways. Most of his arguments focus on whether the officials were deliberately indifferent to an objectively serious medical need and whether the creation and enforcement of the wheelchair-users-only policy violated Turner's constitutional rights. Having already answered both questions in the negative, we now address the additional arguments Turner raises with respect to each individual official.

### 1. *Thebeau and Koenig*

Turner alleges that Thebeau and Koenig were deliberately indifferent to Turner's serious medical needs essentially because they (1) "forced" Turner to be transported and crawl in the non-accessible, unsanitary van and (2) threatened Turner once on March 22, 2011, while they were returning from his appointment at the CRMC.

As discussed above, it is factually incorrect to assert that Thebeau and Koenig "forced" Turner to endure the alleged hardships that he now complains of. In any event, even assuming arguendo that Turner's only option was to crawl in the allegedly unsanitary van, the district court did not err in dismissing Turner's individual-capacity claims against Thebeau and Koenig.

Although it is true that "inmates are entitled to reasonably adequate sanitation, . . . particularly over a lengthy course of time," *Owens v. Scott Cnty. Jail*, 328 F.3d 1026, 1027 (8th Cir. 2003) (per curiam) (quotation omitted), Turner's exposure to the van's allegedly unsanitary conditions did not constitute an Eighth Amendment violation. It is undisputed that the trip between the ERDCC and the CRMC is approximately three hours in each direction, meaning that Turner was exposed to the unsanitary conditions on a single day for a combined maximum of approximately six hours. Assuming Turner's description of the conditions is accurate, he endured an undoubtedly unpleasant, potentially unhealthy experience; nonetheless, the district court did not err in finding no constitutional violation given the record before us and the relative brevity of Turner's experience. *Goldman v. Forbus*, 17 F. App'x 487, 488 (8th Cir. 2001) (per curiam) (finding no constitutional violation when a detainee slept two nights on a cell's floor next to a toilet and "urine was sprinkled on him when his cellmates used the toilet"); *Smith v. Copeland*, 87 F.3d 265, 268–69 (8th Cir. 1996) (finding no constitutional violation when detainee was subjected to "raw sewage" and an "overflowed toilet" in his cell for four days); *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989) ("Conditions, such as a filthy cell, may 'be tolerable for a few days and intolerably cruel for weeks or months.'" (quoting *Hutto v. Finney*, 437 U.S. 678, 687 (1978))).[3]

Similarly, Thebeau's alleged one-time, one-sentence threat to Turner on March 22, 2011, did not amount to a constitutional violation. "Generally, mere verbal threats

---

[3]To the extent Turner argues that his alleged inability to eat a sack lunch during his transportation in the van constitutes an Eight Amendment violation, we disagree. *See Hernandez v. Fla. Dep't of Corr.,* 281 F. App'x 862, 866 (11th Cir. 2008) (per curiam) (holding that an alleged "routine deprivation of lunch to [an inmate] five days per week for about five months" did not constitute an Eighth Amendment violation); *Lindsey v. O'Connor,* 327 F. App'x 319, 321 (3d Cir. 2009) (per curiam) ("The purported deprivation of a single meal is not of such magnitude as to rise to the level of a constitutional violation." (citation omitted)).

made by a state-actor do not constitute a § 1983 claim." *Hopson v. Fredericksen*, 961 F.2d 1374, 1378 (8th Cir. 1992) (citations omitted). "In determining whether the constitutional line has been crossed, a court must look to such factors as the amount of force that was used in relationship to the need presented, the extent of injury inflicted, and the motives of the state officer." *Id.* (quotation omitted). The alleged threat is redressable under § 1983 if it "caused severe injuries, was grossly disproportionate to the need for action under the circumstances and was inspired by malice rather than merely careless or unwise excess of zeal so that it amounted to an abuse of official power that shocks the conscience." *Id.* (quotation omitted).

The isolated "threat" at issue resulted in no "injury"; in fact, neither Thebeau nor Koenig took any action whatsoever to effectuate the threat. Turner admitted that Thebeau was "like kind of laughing about it, kind of like it was funny" when he made the alleged statement, and Turner further admitted that he does not know whether Thebeau was actually "playing" at the time. Thebeau's alleged statement was wholly improper and unprofessional, but it does not amount to an Eighth Amendment violation, particularly when, by Turner's own admission, it may not have been a true statement. *See, e.g.*, *Walton v. Terry*, 38 F. App'x 363, 364–65 (9th Cir. 2002) (affirming dismissal of a prisoner's "Eighth Amendment claim that prison officials threatened him, because verbal threats do not constitute cruel and unusual punishment"); *Hopson*, 961 F.2d at 1378–79 (finding no constitutional violation when officers confined plaintiff in a police car, uttered a racial slur, and threatened to "knock [his] remaining teeth out of his mouth" if he remained silent); *Emmons v. McLaughlin*, 874 F.2d 351, 353–54 (6th Cir. 1989) (finding no constitutional violation when a patrolman threatened the plaintiff and caused him "to fear for his life").

## 2. Mull

Turner argues that Mull was deliberately indifferent to Turner's allegedly

serious medical condition because he allegedly threatened to harm Turner if Turner refused to ride in the non-wheelchair-accessible van on October 20, 2011.

As discussed in Section III.A, the record does not support that Turner had a serious medical need requiring that he use the wheelchair-accessible van. Based on this reason alone, his individual-capacity claim against Mull for alleged deliberate indifference fails. *See Santiago*, 707 F.3d at 990. Moreover, and critically, Turner overlooks his own contradictory deposition testimony in which he admitted that he *does not know* whether it was Mull who allegedly threatened him. Turner's inability to identify who allegedly made the statement is understandable given that, as Turner also testified, the person was "behind" Turner at the time that he or she made the alleged threat. Turner's contradictory testimony alone cannot create a disputed issue of material fact necessary to survive summary judgment. *See, e.g.*, *Marathon Ashland Petroleum, L.L.C. v. Int'l Bhd. of Teamsters*, 300 F.3d 945, 951 (8th Cir. 2002) (holding that a witness's "revised" testimony "does not create an issue of disputed fact" necessary to defeat summary judgment).

### 3. *Chandler*

Turner argues in conclusory fashion that Chandler was deliberately indifferent to his serious medical needs. As discussed above, Chandler's primary involvement in this case was that she requested that Turner be provided a wheelchair-accessible van—even though Turner had no physician's order for the use of such a van, and even though Turner's medical condition neither required him to use a wheelchair to ambulate nor required him to be transported in a wheelchair-accessible van. On this record, Turner's claim against Chandler for violating his constitutional rights lacks any factual support.

### C. *Retaliation Claims*

Turner alleges that Thebeau unlawfully retaliated against him for complaining about Thebeau's allegedly unlawful conduct by participating in a cell search in which

certain of Turner's property was damaged. To establish unlawful retaliation under § 504 of the Rehabilitation Act, Turner must show that (1) he "engaged in protected activity," (2) he was subjected to an "adverse action," and (3) "a causal connection [exists] between the activity and the [adverse] action." *Bradley ex rel. Bradley v. Ark. Dep't of Educ.*, 443 F.3d 965, 976 (8th Cir. 2006) (citing *Neudecker v. Boisclair Corp.*, 351 F.3d 361, 363–64 (8th Cir. 2003)). The elements required for Turner to establish his claim of retaliation under § 1983 are essentially identical to those under the Rehabilitation Act. *L.L. Nelson Enters., Inc. v. Cnty. of St. Louis, Mo.*, 673 F.3d 799, 807–08 (8th Cir. 2012) (requiring (1) "protected activity," (2) "adverse action," and (3) that the "adverse action [be] motivated at least in part by the exercise of the protected activity." (quotation omitted)).

Upon review, we conclude Turner's retaliation claims fail for two independent reasons. First, Turner has provided insufficient evidence of any causal link between his complaints and the cell search. Stripped of their adornments, Turner's claims are based largely on the timing of the events—that is, that the cell search occurred after he lodged a complaint. The mere timing of these events, however, does not establish the causal link necessary to defeat summary judgment. *See Dockery v. Beard*, 509 F. App'x 107, 111 (3d Cir. 2013) (affirming dismissal of retaliation claims in part because "nothing connect[ed] the cell search, confiscation of property, and failure to return [the inmate's] in-cell property to any particular protected activity"); *Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) (affirming summary judgment against a plaintiff's retaliation claim when holding otherwise "would be to engage in the logical fallacy of *post hoc, ergo propter hoc*, literally, 'after this, therefore because of this'" (citation omitted)); *Bermudez v. TRC Holdings, Inc.*, 138 F.3d 1176, 1179 (7th Cir. 1998) ("*Post hoc ergo propter hoc* is not enough to support a finding of retaliation . . . ."). The mere timing of events is particularly unpersuasive in this case given that cells in Turner's cell block are searched "at least once a month" as a matter of course.

Second, as the district court noted, "[a]t most, [Turner] has provided evidence that Thebeau was present, but not personally involved in [the] search." Turner has not, for instance, shown that Thebeau ordered the search or directed the other officers during the course of the search. This court has made clear that "[l]iability under § 1983 requires a causal link to, and direct responsibility for, the deprivation of rights." *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990) (citing *Rizzo v. Goode*, 423 U.S. 362, 370–71, 375–77 (1976), and *Cotton v. Hutto*, 577 F.2d 453, 455 (8th Cir. 1978) (per curiam)). Thus, Turner's failure to establish the requisite level of involvement from Thebeau is fatal to his retaliation claims. *See also Powell v. Martinez*, 579 F. App'x 250, 252 (5th Cir. 2014) (per curiam) (affirming dismissal for failure to state a claim of retaliation against a prison officer in part because the plaintiff did not allege the officer "ordered the cell search").

## D. *Rehabilitation Act Claims*

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, *solely by reason of her or his disability*, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a) (emphasis added). To establish unlawful discrimination under § 504, Turner "must demonstrate that: (1) he is a qualified individual with a disability; (2) he was denied the benefits of a program or activity of a public entity which receives federal funds, and (3) he was discriminated against based on his disability." *Gorman v. Bartch*, 152 F.3d 907, 911 (8th Cir. 1998) (citations omitted). Even if Turner established each of these elements, however, the officials "may demonstrate as an affirmative defense that a requested accommodation would constitute an undue burden." *Id.* (citations omitted).

Turner's claim fails because he has adduced insufficient evidence of unlawful disability discrimination. The ERDCC's policies freely allowed inmates requiring a wheelchair to use the wheelchair-accessible van. The wheelchair-users-only policy

was not instituted to discriminate against wheelchair users or otherwise disabled people; rather, it was rooted in concerns over the undisputed safety hazards associated with people standing on or otherwise improperly using the lift. Moreover, Turner neither used a wheelchair on the days in question nor obtained any physician's order to use the wheelchair-accessible van. His failure to do so precluded him from riding in the wheelchair-accessible van under the ERDCC's policy. Turner has not shown that ERDCC or its employees treated him differently because of his disability.[4]

## E. *Qualified Immunity*

"Government officials who perform discretionary functions are entitled to qualified immunity unless their alleged conduct violated clearly established federal constitutional or statutory rights of which a reasonable person in their positions would have known." *Ottman v. City of Independence, Mo.*, 341 F.3d 751, 756 (8th Cir. 2003) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). For the reasons discussed above, the Prison Defendants did not violate Turner's constitutional or statutory rights. The district court therefore did not err in holding that qualified immunity bars Turner's § 1983 claims against them.

## IV. *Conclusion*

After thoroughly considering all of Turner's arguments on appeal, we affirm the district court's dismissal of Turner's claims.

---

[4]To the extent Turner argues he was entitled to use the wheelchair-accessible van and its wheelchair lift as a reasonable accommodation—even though he was not in a wheelchair and had received no such order from a physician—he is incorrect. The ERDCC was not required to make such an unsafe accommodation. *See Gardner v. Morris*, 752 F.2d 1271, 1280–84 (8th Cir. 1985) (holding that an accommodation was not required under the Rehabilitation Act when it would endanger the plaintiff); *Sharon v. Larson*, 650 F. Supp. 1396, 1402 (E.D. Pa. 1986) (holding that an accommodation not required under § 504 when "the accommodation itself . . . carries its own built-in danger").